THE PARSONS WAGON COMPANY, Respondent, *v.* THE LONG ISLAND RAILROAD COMPANY, Appellant.

Third Department, December 28, 1916.

Carriers — negligence — liability of railroad company for damage to wagon — evidence.

Action to recover damages for injuries to the top panels and back of a milk wagon shipped by the plaintiff and delivered by the defendant, alleged to have been caused by water, either while the wagon was in transit or while it was on the defendant's freight platform. *Held*, that a judgment in favor of the plaintiff on the theory alleged was against the weight of the evidence.

*It seems*, from the evidence, that the damage was caused from the buckling of the pine ceiling of the top because of the use of lumber which had not been kiln dried.

COCHRANE, J., dissented.

APPEAL by the defendant, The Long Island Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Chenango on the 5th day of January, 1916, upon the verdict of a jury for $125, and also from an order entered in said clerk's office on the 18th day of August, 1916, denying defendant's motion for a new trial made upon the minutes.

*Joseph F. Keany* [*William H. Sullivan* of counsel], for the appellant.

*H. C. & V. D. Stratton* [*H. C. Stratton* of counsel], for the respondent.

LYON, J.:

The judgment appealed from should be reversed as against the weight of evidence. The action was brought to recover damages for injuries to the body of a milk wagon shipped by the plaintiff from its factory at Earlville, Chenango county, N. Y., to one George Cloos at Astoria, L. I. The wagon was shipped in four crates, one of which contained the body of the wagon. The crates were delivered for shipment to the New York, Ontario and Western Railroad Company at Earlville, April 4, 1913. They reached Weehawken April ninth. In the early morning of April eleventh the car was placed on a float and delivered at the defendant's Long Island depot that fore-noon, where it was unloaded and the wagon placed upon the freight platform. On Monday, April fourteenth, it was inspected by the consignee, and three days later at his instance by a painter. Their written statements as to the condition practically agree with that of the president of the plaintiff who, on May 13, 1913, inspected the wagon at the covered · storage warehouse of the defendant where it had been taken from the depot freight shed following the consignee's refusal to accept it. The plaintiff's president testified as to the result of such inspection: "I observed that the entire cover under the canvas had greatly swollen and in places forced it up, and to get out of the strain it had buckled up and had forced the sides of the panels out and the joints were open under the top. On the top under the covering where it was open it had begun to start the paint, and the paint separated from the wood underneath. There was nothing else that was injured except the top panels and back. The paint was perfect except the top panels where it was separated from the backing." This wit-ness also testified that the injury he noticed was confined to the top panel; that is, the narrow panel along the top, and the top of the quarter panel, that is, the next panel underneath it; that the two sides and rear end were affected by this injury, the front not being injured at all.

The theory of the plaintiff was that the damage to the wagon top was caused by water, the president of the plaintiff testifying: "I have observed the effect of a stream of water pouring upon the wagon painted in the way this was, upon the

wood and paint. The effect is that if a stream of water has sufficient force upon the paint, it will destroy the paint, and it causes the wood underneath to swell, and the paint is destroyed. The effect it has upon the joints is that naturally the wood is swollen, the joints are the portion that have to give way. I had no knowledge myself from personal observation what made this wagon in this condition. I don't know the reason for it." The plaintiff's president also testified regarding the wagon: "There was special care necessary to be taken for rainy weather. It was necessary to bring it in and store it in a dry place and wipe it off dry." The proof is that the wagon was for general use as a milk peddler's wagon in all seasons of the year and in all kinds of weather. There is no proof that a stream of water was thrown upon the wagon other than may possibly be afforded by its condition. None of the witnesses found any water upon the wagon or saw any water where it had stood. There was no injury to the paint upon any other parts of the wagon. The only evidence as to there having been rain prior to the time the consignee saw the wagon was the memorandum of one of the employees of the New York, Ontario and Western Railroad Company that April eleventh and twelfth were rainy. Following the examination of the wagon by plaintiff's president in May, 1913, the plaintiff presented a claim against the New York, Ontario and Western Railroad Company for damages to the wagon top. One year later, in May, 1914, this action was brought.

The evidence relating to the construction of the wagon is that the sides and back of the body were paneled with half inch poplar, the two lower panels being nine inches wide and above those a two-piece panel reaching to the roof of the wagon which was ceiled with strips four inches wide of three-eighths of an inch regular body matched hard pine pieced from rafter to rafter. Over the roof was a canvas covering filled with three coats of paint on the outside and three coats of paint on the inside, which was brought down over the sides of the wagon, and a moulding tacked on the lower edges to make the top waterproof. The wood constituting the panels was kiln dried. The hard pine constituting the top was merely seasoned and not kiln dried. It was conceded upon the trial

that the box car in which the wagon was shipped from Earlville, and in which it remained until it was unloaded at defendant's depot, was in good condition and not leaky.

There is no proof whatever as to the condition of the wagon top at the time it left plaintiff's factory at Earlville. Neither is there as to any time until it was inspected by Cloos April fourteenth, except that afforded by the testimony of the general foreman of the transfer department of the New York Central Railroad Company at Weehawken, who testified two years and nine months after the occurrence that after he was subpœnaed he looked up his record and refreshed his recollection: that he examined the wagon inside the car, and that the paint on the wagon was not cracked or blistered, nor was the panel sprung or cracked open or bulged out that he could see, but that he did not look under the pieces of crating which came up the sides and over the top, and what scratches there might be under the top covered by the crating he was unable to tell. The testimony of the defendant's witnesses is that from the time the wagon was unloaded from the float it was kept under shelter.

Assuming, however, that the top stood out in the rain April eleventh and twelfth, it would be a most unreasonable contention that water could have passed through the canvas covering with its six coats of paint, and into the hard pine ceiling of the top. Concededly, the whole trouble arose from the buckling of this ceiling, and the preponderance of evidence is that the buckling resulted from the use of lumber which had not been kiln dried; in fact the buckling may well have been wholly attributable to atmospheric conditions. The selling price of the wagon was $175. The jury rendered a verdict for $125.

We think the verdict was against the weight of evidence, and that a new trial should be granted, with costs to the appellant to abide the event.

All concurred, except COCHRANE, J., who dissented.

Judgment and order reversed on the ground that the verdict is against the weight of the evidence, and new trial granted, with costs to the appellant to abide event.